UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| RISKY BUSINESS NOVELTIES AND VIDEOS, INC., *a Minnesota corporation*, | Civil No. 12-2947 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION** |
| COUNTY OF CROW WING, MINNESOTA, | |
| Defendant. | |

Randall D.B. Tigue, **RANDALL TIGUE LAW OFFICE, PA**, 810 North Lilac Drive, Suite 201, Golden Valley, MN  55422, for plaintiff.

Scott T. Anderson, **RUPP, ANDERSON, SQUIRES & WALDSPURGER**, 527 Marquette Avenue South, Suite 1200, Minneapolis, MN  55402, for defendant.

Plaintiff, Risky Business Novelties and Videos, Inc. ("Risky Business"), a Minnesota corporation, brings this action against the County of Crow Wing ("Crow Wing"), pursuant to 42 U.S.C. § 1983.  Risky Business alleges that Crow Wing has violated the First and Fourteenth Amendments by attempting to enforce a new adult use ordinance against it.  Presently before the Court is Risky Business's motion for a preliminary injunction preventing enforcement of the ordinance.  It does not appear that Crow Wing has authority to enforce the ordinance against Risky Business because Risky Business is already subject to an ordinance in the City of Brainerd.  Furthermore, Risky Business has met the standards entitling it to preliminary injunctive relief regarding its

§ 1983 claim. Accordingly, the Court will grant Risky Business's motion for a preliminary injunction.

## BACKGROUND

### I. DRAFTING OF THE ORDINANCE

Timothy Houle became the Crow Wing County Administrator in 2008. (Aff. of Timothy Houle ¶ 1, Dec. 12, 2012, Docket No. 13.) He was previously the Morrison County Coordinator. (*Id.* ¶ 2.) In his position at Morrison County, Houle became aware that an adult use business, the Camp Bar, had problems including prostitutes working at the business. (*Id.* ¶ 4.) The owner of the Camp Bar served jail time for promoting prostitution, filed multiple unsuccessful lawsuits against Morrison County, and was eventually shot and killed in a standoff after holding the Morrison County Board of Commissioners hostage at gunpoint during a regular meeting. (*Id.* ¶¶ 3-6.)

Based on this experience in Morrison County, Houle reviewed Crow Wing's adult use ordinance when he became Crow Wing's County Administrator. (*Id.* ¶ 5.) He determined that "there could have been a more well-defined regulatory scheme to control the time, place and manner of adult use businesses without getting into content." (*Id.* ¶ 7.)[1] Houle spent six to nine months drafting and revising a proposed adult use

---

[1] Specifically, he thought that "a more effective regulatory scheme was necessary to not only negate the secondary effects of adult business[es], but also to address the public health concerns attendant to adult use businesses. For example, for live on-site facilities, regulations requiring a minimum separation between dancers and patrons, prohibiting contact between dancers and patrons, and minimum lighting standards to monitor compliance would help prevent the spread of sexually transmitted diseases." (*Id.* ¶ 7.)

ordinance for the Crow Wing County Board of Commissioners' ("the Board's") review and consideration. (*Id.* ¶ 8.)

## II.   PASSAGE OF THE ORDINANCE AND MATTERS CONSIDERED

### A.   Passage of the Ordinance

On April 10, 2012, the Board held a public hearing on the adult use ordinance drafted by Houle ("the Ordinance"), and there was no public comment. (*See* Ex. B to Compl., Nov. 29, 2012, Docket No. 8; Houle Aff. ¶ 10.) The Board then voted unanimously to approve the Ordinance, and it became effective that same day. (Houle Aff. ¶ 10.)

### B.   Information Reviewed by the Board

Prior to voting, the Board reviewed and considered several land use studies and sample adult use ordinances. (*Id.* ¶ 12, Ex. 5.)[2] These studies and ordinances are from the years 1977, 1986, 1988, 1989, 1991, 1994, 1996, 1999, 2000, and 2001. (Ex. Nos. 1-11, Jan. 3, 2013, Docket No. 20.) In other words, the oldest document was approximately thirty-five years old and the newest approximately eleven years old when the Board approved the ordinance. These studies and ordinances describe a variety of alleged problems associated with adult businesses. For example, they claim a link between adult businesses and higher crime rates, prostitution, increases in violent and sexual crimes, and decreases in residential and commercial property values. The documents make

---

[2] The specific studies and sample adult use ordinances are listed in the "Notes" section of the resolution passed by the Commission. (*See* Ex. B to Compl.)

various recommendations to address these adverse effects, such as not allowing minors into adult businesses, issuing conditional use permits to allow additional restrictions on and reviews of adult businesses, and spreading out adult businesses.

In addition to the studies and ordinances, the Board also claimed to rely on its knowledge of actual conditions within Crow Wing and the surrounding counties, including the circumstances surrounding the Camp Bar, when enacting the Ordinance. (Ex. B to Compl.; Houle Aff. ¶ 13.)  According to Risky Business's expert, who reviewed the minutes of the meeting at which the Board enacted the Ordinance, the Board referenced the allegedly problematic adult use establishments in Morrison County but did not claim that Risky Business had caused any adverse secondary effects. (Decl. of R. Bruce McLaughlin ¶ 12, Nov. 26, 2012, Docket No. 4.)  Risky Business claims that, in the years between 2005 and 2012, it "has not generated any adverse secondary effects in the surrounding community such as an increase in crime, a lowering of property values, or the creation of urban blight." (Compl. ¶ 13, Nov. 26, 2012, Docket No. 1.)

### III.   CONTENTS OF THE ORDINANCE

####   A.   Contents of the Resolution

The Board passed a resolution along with the Ordinance itself.  The Resolution articulates the need for the Ordinance based on Crow Wing's responsibility to protect minors from exposure to sexually-oriented material. (Ex. B to Compl.)  It also discusses alleged adverse secondary effects associated with sexually-oriented businesses such as illegal behaviors like prostitution and drug abuse, casual sexual liaisons and the

transmission of sexually transmitted diseases, negative effects on neighboring businesses, declining property values, and increased crime.  (*Id.*)

### B.     Contents of the Ordinance

#### 1.     Application of the Ordinance

The Crow Wing Ordinance states that it does not apply to businesses in cities or townships that have enacted an adult use licensing ordinance.  (*Id.* at 13.)  It appears that Brainerd, the city where Risky Business is located, has an adult use licensing ordinance with substantial similarities to Crow Wing's Ordinance.  (*See* Compl. ¶¶ 6-7.)

#### 2.     Types of Businesses Restricted

The Crow Wing Ordinance itself contains several sections, including licensing, fees, sanctions for violations, inspections, and regulation and performance standards. (Ex. B to Compl.)  The Ordinance requires that sexually-oriented businesses obtain a license from Crow Wing's Public Health Department to operate their businesses.  (*Id.* § Sec. II, A.)

Under the Ordinance, a sexually-oriented business is defined as:

1) any business or enterprise where the primary or dominant theme is the presentation display, depiction, or description of specified anatomical areas or specified sexual activities; or

2) any business or enterprise where the sum total of floor, wall, or shelf area devoted to uses or activities which emphasize the presentation, display, depiction, or description of specified anatomical areas or specified sexual activities, for more than seven (7) days per year, exceeds forty (40) square feet.

> 3) The term includes, but is not limited to, adult body painting studios, adult cabarets, adult companionship/conversation/rap establishments, adult health/sport clubs, adult massage parlors, adult modeling studios, adult sauna/steam room/bathhouse facilities, adult mini-motion picture theatres, adult motion picture arcades, adult motion picture theatres, adult bookstores, and adult novelty businesses.

(*Id.* § I, R.) Crow Wing stated at oral argument that it believes that a business must satisfy prongs (1) or (2) of the definition of a sexually-oriented business in order to be subject to the Ordinance. In other words, a business would not be subjected to the restrictions in the Ordinance **solely** because it qualifies, for example, as an adult bookstore under prong (3). The Court will accept Crow Wing's interpretation of its Ordinance for purposes of this motion.

The Ordinance defines "Specified Anatomical Areas" as "less than completely and opaquely covered human genitals, pubic region, buttock, anus or female breast(s) below a point immediately above the top of the areola; and, exposed or opaquely covered human male genitals in discernibly turgid state." (*Id.* § I, S.) "Specified Sexual Activities" is defined as covering a variety of activities, including sexual intercourse. (*Id.* § I, T.)

### 3. Licensing Requirements

If a business qualifies as a sexually-oriented business under the Ordinance, it is subject to various restrictions and requirements. For example, the Ordinance makes it a criminal offense to operate a sexually-oriented business without a license; requires the

submission of applications for a license, which must include certain information[3]; requires the payment of fees; requires that all doors, windows, and other openings to the business be covered with an opaque material to prevent a person outside the premises from seeing the material or activities within; permits the sheriff's department, public health department, planning and zoning office "or any other County or State department or agency" to inspect the premises at any time it is open for business; requires that no signs contain any message or image that identifies specified sexual activities or mentions specified anatomical areas; requires that all graffiti must be removed within forty-eight hours and that there be video surveillance of the entrance; and requires that the business be closed between 12 AM and 10 AM on any day.

### IV.    ENFORCEMENT OF CROW WING ORDINANCE

Risky Business is located in Crow Wing, in the city of Brainerd. Crow Wing has attempted to enforce its Ordinance against Risky Business. However, such enforcement is currently on hold pending resolution of this motion. (*See* Ex. A to Compl. ¶ 9, Nov. 29, 2012, Docket No. 8.)

Crow Wing's attempt to enforce its ordinance began when Crow Wing's Public Health Nurse, Andrea Deyo, sent a letter to Ronald Beattie Jr., Risky Business's owner, informing him of the Ordinance and requesting a meeting to discuss its effects on Risky

---

[3] The Ordinance requires that the application include a floor plan showing the type of activities that will be conducted in each area of the sexually-oriented business. The applicant must also provide a driver's license, criminal history, employment record, and picture of his or her face.

Business.  (Aff. of Andrea Deyo, ¶¶ 1-2, Ex. 1, Dec. 12, 2012, Docket No. 12.)  Deyo dropped off a copy of the Ordinance at Risky Business on August 28, 2012, and made a site visit on August 30, 2012.  (*Id.* ¶ 3.)  At this visit, she provided Beattie another copy of the Ordinance as well as other paperwork.  (*Id.*)  Beattie submitted an application for a sexually-oriented business license on October 11, 2012, investigative and license fees on October 12, 2012, and a supplement to his application on October 22, 2012.  (*Id.* ¶¶ 4-6.)  With his application, he submitted a diagram of Risky Business.

Deyo then inspected Risky Business on November 20, 2012, and completed a sexually-oriented business inspection form.  (*Id.* ¶ 7, Ex. 3.)  She discussed with Beattie ways in which Risky Business was not in compliance with the Ordinance, namely the doors, windows, and other openings were not covered with an opaque material and the video surveillance system was not functional.  (*Id.* ¶ 7.)  She informed Beattie that he had ten working days to bring the store into compliance or his license application would be denied.  (*Id.* ¶ 7.)

According to Deyo, the diagram that Risky Business submitted of its store to Crow Wing is misleading.  (*Id.* ¶ 8; *see also id.*, Ex. 4.)  The diagram shows that Risky Business has a room for adult videos, a room for adult novelties, and an area for general clothing and merchandise.  (*Id.* ¶ 8.)  Using the numbers submitted on the floor plan, the room containing adult videos is approximately 130 square feet and the room holding the adult novelties is in excess of 215 square feet.  (*Id.*, Ex. 4.)  According to Deyo, however, many items labeled as general clothing and merchandise in fact depicted sexual organs

and/or acts. (*Id.* ¶ 9.) Deyo acknowledged that there were also many items in the general clothing and merchandise area that were not sexually-oriented. (*Id.* ¶ 9.)

Beattie claims that Risky Business always has "one [adult] video tape less than 25 percent of his inventory" that occupies "one square foot less than 25 percent of the floor space." (*See* Ex. A to Compl.) Crow Wing responds that it does not know whether this allegation is accurate. (*See id.*)[4]

## ANALYSIS

**I.   STANDARD OF REVIEW**

The Court must consider four factors in determining whether a preliminary injunction should be granted: (1) the threat of irreparable harm to the moving party; (2) the state of balance between the alleged irreparable harm and the harm that granting the preliminary injunction would inflict on the other party; (3) the likelihood of the moving party's success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "At base, the question is whether the

---

[4] When Risky Business first opened in 2005, an issue arose as to whether or not the store was an "adult establishment" within the meaning of Brainerd City Code. Brainerd's ordinance has similarities to Crow Wing's ordinance and defines adult establishments and adult bookstores as businesses having a "substantial or significant portion" of their revenue stemming from sexually-oriented items. (*See* Compl. ¶¶ 6-7.) In March 2005, Risky Business's attorney reached an agreement with Mark Ostgarden, City Planner for the City of Brainerd, whereby the City and Risky Business agreed that for the purposes of the definitions contained in the City Ordinance, "substantial or significant portion" would amount to twenty-five percent of Risky Business's inventory and twenty-five percent of the floor space. (*Id.* ¶ 9.)

balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

## II.  APPLICATION OF ORDINANCE

As an initial matter, it is not apparent to the Court in examining the language of the Crow Wing Ordinance that it can be applied by its terms against Risky Business. As noted above, the Crow Wing Ordinance states that it does not apply to businesses in cities or townships that have enacted an adult use licensing ordinance. It appears that Brainerd has an adult use licensing ordinance. The Court finds, by reviewing the plain language of the Crow Wing Ordinance, that it likely cannot be applied in the City of Brainerd. Indeed, at oral argument, Crow Wing did not deny that this section of Crow Wing's Ordinance might prohibit its enforcement in the City of Brainerd. This fact suggests that an injunction against the enforcement of Crow Wing's Ordinance is appropriate and that Risky Business has a likelihood of success in showing that the Crow Wing Ordinance is not enforceable against it. The Court will not address this matter further, however, because it has not been briefed by the parties and the Court does not have enough information to fully analyze this issue.

## III.  CONSTITUTIONAL CLAIMS

### A.  Likelihood of Success on the Merits

The Court will first address the likelihood of success on the merits because the Eighth Circuit often emphasizes this factor and has held that "the absence of a likelihood

of success on the merits strongly suggests that preliminary injunctive relief should be denied." *See CDI Energy Srvs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Crow Wing claims that Risky Business is subject to the Ordinance because it qualifies as a sexually-oriented business. As noted above, a sexually-oriented business is defined as including any business or enterprise where the sum total of floor area devoted to uses or activities that emphasize the presentation, display, depiction, or description of specified anatomical areas or specified sexual activities, for more than seven days per year, exceeds forty square feet. (Ex. B to Compl., § 1, R(2).) The floor plan submitted with Risky Business's license application shows that the square footage of its adult novelty room alone is over 215 square feet. (Deyo Aff., Ex. 4.) Thus, Crow Wing argues that Risky Business is a "sexually-oriented business." Risky Business claims that the Ordinance, including its application to Risky Business as a "sexually-oriented business," violates the First Amendment.

When analyzing the constitutionality of an ordinance under the First Amendment, the Court must first determine if the ordinance is "content-neutral." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* "Thus, even if a time, place, and manner ordinance regulates only businesses selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen undesirable secondary effects attributable to those businesses, such as increased crime, lower property values, or deteriorating

residential neighborhoods." *ILQ Invs., Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir. 1994). The Court will assume for the purposes of this motion that Crow Wing's ordinance is content-neutral.[5]

Next, the Court must determine if the content-neutral regulation is "designed to serve a **substantial governmental interest**." *Id.* (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986)) (emphasis added). As part of this analysis, the Court must consider whether the regulations are **narrowly tailored** to serve the articulated governmental interest. *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 686 (8th Cir. 2012); *Excalibur Grp., Inc. v. City of Minneapolis*, 116 F.3d 1216, 1220 (8th Cir. 1997).[6] To be "narrowly tailored," the regulation need not be the least restrictive means of serving a county's content-neutral interest. *Excalibur Grp.*, 116 F.3d at 1221. Rather, the requirement is satisfied if the substantial governmental interest at issue "would be achieved less effectively absent the regulation and the means chosen does not burden substantially more speech than is necessary to further the [county's] content-neutral interest." *Id.* (internal quotation marks omitted).

---

[5] It is possible that evidence could arise showing that Crow Wing enacted the Ordinance for reasons that were not content-neutral. *See, e.g.*, *PAO Xiong v. City of Moorhead, Minn.*, 641 F. Supp. 2d 822, 832 (D. Minn. 2009) ("The record is inadequate to permit the Court to determine whether the City reasonably believed that the restrictions regarding adult establishments' hours of operation are content-neutral and related to a substantial governmental interest."). However, such evidence has not been presented to the Court.

[6] Courts also consider whether regulations unreasonably limit alternative avenues of communication. *Phelps-Roper*, 697 F.3d at 693; *ILQ Invs.*, 25 F.3d at 1418.

1.      **Substantial Governmental Interest**

First, the Court must determine if Risky Business has demonstrated a significant governmental interest in its Ordinance. *See Phelps-Roper*, 697 F.3d at 693 (considering existence of significant governmental interest). Curbing unwanted secondary effects of sex businesses is a substantial governmental interest. *ILQ Invs.*, 25 F.3d at 1416. But in order for an Ordinance to serve that interest, it must be reasonably designed. *Id.*

Risky Business argues that there is insufficient evidence about the negative effects of Risky Business, in particular, to support the Ordinance. The Court does not find this argument persuasive.[7] Nonetheless, the Court finds that Risky Business is likely to succeed in showing that Crow Wing has not demonstrated a substantial governmental interest in the Ordinance. "Government bodies may not . . . rely on 'shoddy data or reasoning' in enacting an ordinance regulating adult property uses[,]" *Flirts, Inc. v. City of Harris, Minn.*, 796 F. Supp. 2d 974, 979 (D. Minn. 2011) (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002)), because reliance on evidence supporting an ordinance must be reasonable, *BZAPS, Inc.*, 268 F.3d at 606.

Here, the most recent study relied on by Crow Wing was a decade old and the most dated was four decades old, and the Court has no evidence that these studies are still

---

[7] Studies conducted by other jurisdictions can serve as a sufficient basis for an adult use ordinance. *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 606 (8th Cir. 2001) ("A city need not conduct its own study regarding these effects . . . but may rely on evidence already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses[.]" (internal quotation marks omitted)). An ordinance can also be proper even though the governmental entity has not demonstrated that the particular use of a specific business is harmful, "so long as the [county] reasonably believes that the use is related to other uses that have been shown to cause secondary effects." *Id.* at 606.

applicable today. *See PAO Xiong v. City of Moorhead, Minn.*, 641 F. Supp. 2d 822, 827 (D. Minn. 2009) ("[T]here may come a time when . . . studies are so old and outdated that a municipality's reliance on the studies' analysis in determining relevant secondary effects will no longer be reasonable."). Reliance on these studies seems potentially unreasonable given that the Internet has made adult materials much more widely available than they were in the 1970s, 1980s, 1990s, and even the early 2000s. These societal developments call into question whether the purported secondary effects of businesses that sell such widely-available material are the same today as they were decades ago. *See id.*

Additionally, Crow Wing seemingly relied on very little information other than the dated studies and ordinances. Crow Wing has provided almost no information regarding information it relied on in enacting the Ordinance outside of these studies and ordinances, except for one piece of extreme evidence regarding the criminal acts of a bar owner in a different county. Thus, although this issue is a close one, the Court finds at this preliminary stage that the County may have been unreasonable in relying on the evidence it used to support the Ordinance. *See DiMa Corp. v. High Forest Twp.*, Civ. No. 02-3800, 2003 WL 21909571, at *4 (D. Minn. Aug. 7, 2003).

### 2.  Narrowly Tailored

Next, the Court will consider if Risky Business is likely to succeed in showing that the Ordinance is not narrowly tailored. *See Phelps-Roper*, 697 F.3d at 693 (considering whether ordinance is narrowly tailored). In determining whether an ordinance is

narrowly tailored, governmental bodies have some latitude in determining how to address problems they have identified. *See Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 71 (1976). As the Supreme Court stated:

> So long as the means chosen are not substantially broader than necessary to achieve the government's interest[,] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 800 (internal quotation marks omitted).

An ordinance is not narrowly tailored if it is overbroad.[8] The First Amendment doctrine of overbreadth is an exception to the general rule that a person to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may be unconstitutionally applied to others. *See Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987). The purpose of this exception is to guard against the danger that a statute or ordinance may chill the legally protected speech of those not before the court. *See id.* A statute may be invalidated on its face only if the overbreadth is "substantial." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985).

---

[8] *See Ways v. City of Lincoln, Neb.*, 274 F.3d 514, 519 (8th Cir. 2001) ("Because the ordinance burdened First Amendment expression that has not been shown clearly to contribute to the problems the city sought to solve, it was not appropriately tailored to achieve its stated purposes."); *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1221 (8th Cir. 1998) ("Although a governmental restriction does not have to be the least restrictive or least intrusive means of regulation, it may not, under well-established constitutional standards, curtail substantially more speech than is necessary to accomplish its purpose[.]").

In this case, the Court finds that Risky Business has demonstrated a fair likelihood of prevailing on a claim that the Ordinance is overbroad and, therefore, not narrowly tailored. *See Krantz v. City of Fort Smith*, 160 F.3d 1214, 1221 (8th Cir. 1998) ("[T]he ordinances suppress considerably more speech than is necessary to serve the stated governmental purpose[.]"). The Ordinance's licensing requirements apply to any "business or enterprise" that meets certain qualifications. Thus, these requirements could apply to an art museum that included paintings of nude women, such as a museum that had an area of greater than forty square feet that displayed less than completely and opaquely covered female breast(s) below a point immediately above the top of the areola. The Eighth Circuit struck down a statute in a similar case where the statute could apply to theater performances, ballet performances, and many other forms of live entertainment and prohibited performers from engaging in "sexual contact," including kissing. *See Ways*, 274 F.3d at 518-20. Like the statute in *Ways*, the Crow Wing Ordinance may cast too broadly and infringe upon constitutionally protected artistic expression. *See id.* Similarly, the Ordinance could apply to stores the size of a Walmart if even a small, forty square foot area contained adult materials. The Court finds that an Ordinance that could apply to stores with a small percentage of adult material may be overbroad, particularly if that material is separated from the other material in the store.[9] Accordingly, at this stage,

---

[9] *See, e.g.*, *Exec. Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 796-97 (6th Cir. 2004); *Wil-Kar, Inc. v. Vill. of Germantown*, 153 F. Supp. 2d 982, 993 (E.D. Wis. 2001); *Wolff v. City of Monticello*, 803 F. Supp. 1568, 1573 (D. Minn. 1992); *World Wide Video, Inc. v. City of Tukwila*, 816 P.2d 18, 21 (Wash. 1991) (en banc).

the Court finds that Risky Business has demonstrated a fair likelihood of success on the merits.[10]

### B.   Other *Dataphase* Factors

The Court must next consider the other three *Dataphase* factors.  One of these facts is the threat of irreparable injury.  It is well-settled that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Because Risky Business has established a sufficient likelihood of success on its First Amendment claim, it has also shown a threat of irreparable harm as the result of the deprivation of its First Amendment rights.

Next, the Court should consider the balance between the alleged irreparable harm and the harm that granting the preliminary injunction would inflict on the other party. "The balance of equities . . . generally favors the constitutionally-protected freedom of expression."  *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), overruled on other grounds by *Phelps-Roper*, 697 F.3d at 686.  Crow Wing argues that if a preliminary injunction is issued, it will create irreparable harm to Crow Wing by a continuous and knowing violation of the County's duly promulgated laws and regulations.  The Court

---

[10] Although this issue is less clear, the Ordinance may also not be narrowly tailored as applied.  Risky Business appears to have a room containing adult videos that is approximately 130 square feet and a room holding the adult novelties that is around 215 square feet.  It is not apparent to the Court that prohibiting this small amount of material promotes the governmental interests outlined by Crow Wing, particularly in light of insufficiencies in the studies upon which Crow Wing relied.

finds, however, that allowing a business to operate while the Court determines the constitutionality of the County's ordinance does not undermine the authority of the governmental body. *See Fantasysrus 2, L.L.C. v. City of East Grand Forks, Minn.*, Civil No. 12-1176, 2012 WL 3030354, at *5 (D. Minn. July 25, 2012). The Court thus finds that this factor weighs in favor of a preliminary injunction.

Finally, because "[i]t is always in the public interest to protect constitutional rights," *Phelps-Roper*, 545 F.3d at 690, the Court concludes that this final factor weighs in favor of a preliminary injunction. Although Crow Wing has identified some important goals that it associated with its Ordinance, as the Court explained above, the County has failed to show that it is reasonable to believe that its Ordinance will achieve these goals. Thus, Risky Business has shown that the public interest weighs in its favor.

The Court therefore finds that each of the *Dataphase* factors supports a preliminary injunction. Although it is unclear if Risky Business will ultimately prevail in its First Amendment challenge, it appears at this stage that Risky Business is likely to succeed on the merits. Risky Business has also shown that the other *Dataphase* factors weigh in its favor. Accordingly, the Court will grant Risky Business's motion.

## IV. SECURITY REQUIREMENT

Federal Rule of Civil Procedure 65 requires that a preliminary injunction or a temporary restraining order shall only issue if the applicant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained." Fed R. Civ. P. 65(c). Risky Business asks that the Court waive the security requirement.

Because the County did not object to Risky Business's request that the security requirement be waived, the Court will grant the waiver. *See Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713, 723 (D. Minn. 2006) (granting a waiver when the defendant had not objected or otherwise "addressed this issue or attempted to quantify any dollar amount of harm that it may face from a wrongly issued injunction").

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Preliminary Injunction [Docket No. 2] is **GRANTED**. A preliminary injunction is hereby entered against Defendant as follows:

> Until further order of this Court, Defendant is enjoined from enforcing the provisions of the Crow Wing County Ordinance related to sexually-oriented businesses against Plaintiff in the operation of Plaintiff's business Risky Business at 326 Washington Street in the City of Brainerd, County of Crow Wing, State of Minnesota.

2. Plaintiff is not required to provide security under Federal Rule of Civil Procedure 65(c).

DATED: April 9, 2013　　　　　　　　　　　　s/ John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　United States District Judge